CARLIE CHRISTENSEN, United States Attorney (No. 663)
MARK Y. HIRATA, Assistant United States Attorney (No. 5087)
Attorneys for the United States of America
185 South State Street, Suite 300
Salt Lake City, Utah 84111
Telephone: (801) 524-5682

FILED
U.S. DISTRICT COURT

2011 APR -6  P 3: 33

DISTRICT OF UTAH

BY:_____
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

SEALED

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | **SEALED** |
| Plaintiff, | : | I N D I C T M E N T |
| v. | : | Vio.  18 U.S.C. § 371 (Conspiracy)<br>Count 1 |
| KELLY DEAN HARVEY, | : | |
| Defendant. | : | 18 U.S.C. § 1343 (Wire Fraud)<br>Counts 2 - 13 |
| | : | 18 U.S.C. § 1341 (Mail Fraud)<br>Counts 14 - 22 |
| | : | |
| | : | 18 U.S.C. § 1956(a)(1)(B)(i)<br>(Concealment Money Laundering)<br>Counts 23 through 27 |
| | : | |
| | : | 18 U.S.C. § 1957<br>(Monetary Transaction Money<br>Laundering)<br>Counts 28 through 31 |
| | : | |

The Grand Jury charges:

Case: 2:11-cr-00276
Assigned To : Kimball, Dale A.
Assign. Date : 4/6/2011
Description: USA v.

1

# BACKGROUND

At all times relevant to this Indictment:

**The U.S. Food and Drug Administration's Regulation of Drugs**

1.      The United States Food and Drug Administration (the "FDA") was the agency of the United States charged with the responsibility of protecting the health and safety of the American consuming public by assuring, among other things, that drugs sold for administration to humans were safe and effective for their intended uses and bore labeling containing complete, true, and accurate information. The FDA's responsibilities included regulating the labels, labeling, distribution, and manufacture of drugs shipped or received in interstate commerce. The FDA's responsibilities also included inspecting facilities where drug products were manufactured, labeled, and packaged; examining the records at such facilities to determine whether the drugs were manufactured, labeled, and packaged under conditions whereby their quality could be assured; examining the facilities and controls used; and, where appropriate, preventing products that were improperly manufactured, labeled, and packaged from reaching the marketplace.

2.      In order to legally market a drug in interstate commerce, the drug's manufacturer was required to comply with all applicable provisions of the Federal Food, Drug, and Cosmetic Act (the "FDC Act"), 21 U.S.C. § 321, et seq., and its implementing regulations. The FDA was responsible for enforcing the provisions of the FDC Act.

3.      The FDC Act defined the term "drug" to include articles that (1) were

2

intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in

man; (2) were intended to affect the structure or any function of the body of man; or (3)

were intended for use as a component of articles in (1) or (2).  21 U.S.C. §§ 321(g)(1)(B),

(C), and (D).

**FDA's Regulation of Drugs to Treat Erectile Dysfunction**

4.     "Viagra" was a drug product that was approved by FDA to treat erectile

dysfunction.  The established name of the active ingredient in Viagra was "sildenafil

citrate."  Viagra was a prescription drug within the meaning of 21 U.S.C. §§ 353(b)(1)(A)

and (B).  The FDA approved Viagra, which was manufactured by Pfizer, Inc. ("Pfizer"),

for marketing in March 1998.

5.     A drug containing sildenafil citrate was a prescription drug because of its

effect on the human body.  A drug that contained sildenafil citrate, among other things,

opened capillaries, which increased blood flow and heart rate.

6.     With regard to Viagra, which contained sildenafil citrate, the FDA reviewed

clinical trials and their results before the agency approved the drug.  FDA's review

resulted in the posting of possible adverse reactions in Viagra's labeling.  Licensed

practitioners were warned by Pfizer labeling that persons on heart medications (such as

Plavix) or blood-thinning medications (such as Coumadin) could suffer a heart attack or

stroke if they used sildenafil citrate.  Pfizer, as the distributor of Viagra, advised

practitioners not to prescribe Viagra to any patients with heart conditions, warning that

the effects of Viagra could cause blood pressure to drop to an unsafe or life-threatening level.

7.      One of the most common side effects when using sildenafil citrate is headaches.

8.      Under the FDC Act, the term "label" meant a display of written, printed, or graphic matter upon the immediate container of any article.  21 U.S.C. § 321(k).

9.      Under the FDC Act, the term "labeling" meant all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article.  21 U.S.C. § 321(m).

**Prohibited Act**

10.      The FDC Act prohibited the introduction or delivery for introduction into interstate commerce, or the causing thereof, of any drug that was misbranded.  21 U.S.C. § 331(a).

**Misbranded Drugs**

11.      Under the FDC Act, a drug was deemed to be misbranded if, among other circumstances:

    a.      its labeling was false or misleading in any particular, 21 U.S.C. § 352(a); or

    b.      the label did not bear the established name and quantity of each active ingredient, 21 U.S.C. § 352(e)(1)(A).

/

4

**The Co-Conspirators**

12. Defendant KELLY DEAN HARVEY ("defendant HARVEY") was a resident of Salt Lake County, Utah. TSN Labs, Inc. ("TSN Labs"), later acquired and renamed Novacare, LLC ("Novacare") (collectively, "TSN"), were partly owned and managed by defendant HARVEY.[1] TSN and Novacare were businesses incorporated in the State of Utah with its primary business location at 330 West 6100 South, Murray, Utah 84107. Defendant HARVEY held and controlled the following bank accounts, among others, identified below:

- TSN Labs, Inc. - Account No. xxxxx-1002 at Zions Bank ("TSN1 account"), a financial institution as defined in 31 U.S.C. § 5312(a)(2)(A).

- TSN Labs, LLC - Account No. xxxx-xxxx-4675 at Key Bank ("TSN2 account"), a financial institution as defined in 31 U.S.C. § 5312(a)(2)(A).

- Novacare, LLC - Account No. xxxx-2365 at Bank of American Fork ("Novacare account"), a financial institution as defined in 31 U.S.C. § 5312(a)(2)(A).

13. Unindicted co-conspirator 1 ("UC1") was a resident of Grand Rapids, Michigan, and owned Impulsaria LLC and IC Marketing, whose business locations were at, among others, 470 Market Avenue SW, Suite 205, Grand Rapids, Michigan 49503.

---

[1] Prior to June 2008, defendant HARVEY was the sole owner of TSN Labs. In around June 2008, an approximately 51 percent ownership interest in TSN Labs was sold to a third-party entity, TSN Asset Management (owned by N.B.), and the company was renamed Novacare.

UC1 resided at 817 Joslin Street SE, Grand Rapids, Michigan 49507. UC1 held and controlled the following bank account, among others, identified below:

- Impulsaria, LLC - Account No. xxxxx-3051 at AmSouth Bank ("Impulsaria account"), a financial institution as defined in 31 U.S.C. § 5312(a)(2)(A).

14. Unindicted co-conspirator 2 ("UC2") resided in China but also maintained a residence in Wesley Chapel, Florida, and owned Regent Pharmaceuticals Group, Inc., located at 2102 Camp Indianhead Road, Land O Lakes, Florida 34639.

## Count 1
## 18 U.S.C. § 371
## (Conspiracy)

15. The Grand Jury incorporates by reference the allegations in paragraphs 1 through 14 as if fully stated herein.

16. From on or about a date unknown to the Grand Jury but at least as early as April 2007 to in or around June 2010, in the Central Division of the District of Utah and elsewhere,

## KELLY DEAN HARVEY,

defendant herein, UC1, UC2, and other persons known and unknown to the Grand Jury, did knowingly and willfully combine, conspire, confederate and agree, at various times described herein, to commit the following offenses against the United States:

a. knowingly, with the intent to defraud and mislead, introduced and delivered for introduction into interstate commerce, and caused to be introduced and delivered, a misbranded drug, in violation of 21

U.S.C. §§ 331(a) and 333(a)(2) (Introducing Misbranded Drugs Into Interstate Commerce);

b.     knowingly devised and intended to devise a scheme and artifice to defraud and to obtain money and funds by means of false and fraudulent pretenses, representations, and promises, and in furtherance thereof, used and caused to be used interstate wire transmissions, in violation of 18 U.S.C. § 1343 (Wire Fraud); and

c.     knowingly devised and intended to devise a scheme and artifice to defraud and to obtain money and funds by means of false and fraudulent pretenses, representations, and promises, and in furtherance thereof, used and caused to be used a private and commercial interstate carrier, in violation of 18 U.S.C. § 1341 (Mail Fraud).

## OBJECT OF THE CONSPIRACY

17.    The object of the conspiracy and the scheme and artifice to defraud was to fraudulently manufacture, distribute, and market in interstate commerce a drug as a "dietary supplement" to evade and avoid appropriate government regulation by the FDA and for financial gain.

## MANNER AND MEANS OF THE CONSPIRACY AND THE SCHEME AND ARTIFICE TO DEFRAUD

Defendant HARVEY, UC1, and UC2, and others known and unknown to the Grand Jury used the following manner and means, among others, to carry out the objects of the conspiracy and the scheme and artifice to defraud:

### Importation of an ED Drug from China

18.    It was part of the conspiracy that defendant HARVEY and UC2 imported from China a raw ingredient called Ophioglossum Thermale ("OT") for use by defendant

7

HARVEY to manufacture "dietary supplements" targeted for men seeking to enhance their sexual experiences or address erectile dysfunction (hereafter, "ED products").

19.    It was further part of the conspiracy that UC2 operated as a broker for the purchase of OT from Rizhao Sunan Trading Co., Ltd. ("RS Trading"), a company located in Shandong, China. RS Trading shipped OT directly from China to defendant HARVEY and TSN in Utah. UC2 also had an assistant, K., who facilitated orders from defendant HARVEY for OT.

20.    It was further part of the conspiracy that from around November 2006 to around May 2010, defendant HARVEY placed and received approximately 39 orders (each order ranging from 1 to 75 kilograms) for OT which UC2 brokered from China.

21.    It was further part of the conspiracy that, acting at UC2's and RS Trading's direction, defendant HARVEY caused payments for OT orders to be made through wire transfers of funds from the TSN and Novacare accounts in Utah to a bank account in the name of Ruijin Zhonggyo Co. Ltd. (a company located in Beijing, China) at Standard Chartered Bank ("RZ account") in Hong Kong, China.

22.    It was further part of the conspiracy that from around November 2006 to around May 2010, a total of approximately $931,000 was wire transferred from the TSN and Novacare accounts in Utah to the RZ Account in China for the purchase of OT.

23.    It was further part of the conspiracy that defendant HARVEY, UC1, and UC2 learned that consumers of product containing OT experienced varying degrees of

headaches, a common side effect when using sildenafil citrate (Viagra), vardenafil (Levitra), or tadalafil (Cialis).

24.     It was further part of the conspiracy that defendant HARVEY caused two U.S. laboratories to test the OT imported from China to determine the presence of a drug, including sildenafil citrate, or any synthetic active drug ingredient. Although the lab results did not confirm the presence of sildenafil citrate (Viagra), vardenafil (Levitra), or tadalafil (Cialis), they confirmed the presence of a compound with characteristics similar to sildenafil or what appeared to be a sildenafil drug analogue. The foregoing circumstance, if known by the FDA, would subject both OT and any ED products containing OT to government regulation as a drug. Defendant HARVEY controlled the limited dissemination of the foregoing lab results, including to the exclusion of the FDA.

25.     On or about February 21, 2009, the FDA posted a consumer alert on its website titled, "Hidden Risks of Erectile Dysfunction 'Treatments' Sold Online." The alert warned that "[m]en looking online for 'dietary supplements' to treat erectile dysfunction or enhance their sexual performance should beware: these products may contain prescription drugs or other undisclosed ingredients that can be harmful." More specifically, the alert warned that an FDA-led Internet survey found that "more than one-third of purchased 'dietary supplements' claiming to spur sexual enhancement or treat ED contained undisclosed prescription drug ingredients or similar substances," and that "[s]ix of the 17 products contained sildenafil (the active ingredient in Viagra) or a substance

9

similar to sildenafil or vardenafil . . . the active ingredient in Levitra, another FDA-approved prescription drug that treats ED."

26.     On or about November 5, 2009, the FDA posted a consumer safety alert on its website titled, "FDA Warns Consumers on Sexual Enhancement Products - Another Dietary Supplement is Found to be Contaminated with Potentially Dangerous Ingredient." The alert warned consumers that "Stiff Nights, a product marketed as a dietary supplement for sexual enhancement, contains an ingredient that can dangerously lower blood pressure and is illegal." The alert also stated, "In the case of Stiff Nights, following a consumer complaint, the FDA determined that the product contains sulfoaildenafil. This is a chemical similar to sildenafil, the active ingredient in Viagra. Sulfoaildenafil may interact with prescription drugs known as nitrates, including nitroglycerin, and cause dangerously low blood pressure." Defendant HARVEY discussed the foregoing alert with UC1 and UC2.

27.     It was further part of the conspiracy that despite the presence of what appeared to be a sildenafil drug analogue, defendant HARVEY and UC2 continued to import OT from China for use by TSN in its manufacturing of ED products including, among others, Stiff Nights.

28.     It was further part of the conspiracy that despite the November 5, 2009 alert, defendant HARVEY and UC2 continued to import OT from China for use by TSN in its manufacturing of ED products, including Stiff Nights.

29.     From on or about March 8, 2010 to on or about March 22, 2010, FDA conducted an inspection at TSN's facilities at 330 West 6100 South in Murray, Utah. During the inspection, FDA inspectors obtained samples of three raw ingredients used in the manufacturing of Stiff Nights, including a 50 gram sample of OT.  Defendant HARVEY identified the OT as "OT Extract," one of the ingredients used to manufacture Stiff Nights which is obtained from a company in China.  Subsequent tests of the OT sample conducted by an FDA laboratory were positive for sulfoaildenafil.

30.     It was further part of the conspiracy that defendant HARVEY kept UC1 apprised of his on-going dealings with UC2, third-party and the FDA's findings concerning OT's ingredients, and problems and concerns which the above circumstances created with the FDA.

**The Manufacturing and Fraudulent Marketing of an ED Drug in the United States**

31.     It was further part of the conspiracy that from around March 2007 to around June 2010, defendant HARVEY and TSN manufactured and fulfilled ED products containing OT for TSN, UC1, and others to market and distribute through various companies under brand names which included, among others, "Stiff Nights," "Aziffa," "Size Matters," "Erex," "Mojo," "Hard Drive," "Straight Up," "MONSTER EXCYTE," "Natural WOW! Ultra Perform for MEN," "Natural WOW! Ultra Perform for WOMEN," "OMG," "ProLatis," "Verect," "Xaitrix," "Zilex (with golden spear)," "Eyeful," RedMagic," and "Zotrex."

11

32.     From around April 2007 to around June 2010, defendant HARVEY and TSN billed UC1 and his companies over $2 million for ED products.

33.     From around April 2007 to around June 2010, UC1 and his companies paid defendant HARVEY and TSN over $2 million for ED products.

34.     It was further part of the conspiracy that UC1 and Impulsaria promoted Stiff Nights over the Internet at www.stiffnights.com as a "male sexual stimulant," "dietary supplement," "100% Natural," and "100% safe."  Both the list of ingredients set forth on the Stiff Nights label and packaging falsely and fraudulently omitted OT as an ingredient, that it contained sulfoaildenafil, or that it appeared to be a sildenafil drug analogue.  The "View Ingredients" page on the website also failed to make the foregoing disclosure.  In addition, the FAQ (i.e., frequently asked questions) page on the website compared Stiff Nights to Viagra in the following respects:

> Stiff Nights is different than Viagra because Stiff Nights is a nonprescription nutritional supplement.  Stiff Nights is not a drug.  Many users report a better experience than Viagra because Stiff Nights also increases the male sex drive and somehow increases a male's endurance. Since the formula uses only all natural ingredients it seems logical that you reduce the risks of certain side effects associated with Viagra.  No formal study has been done on this.  In addition, Stiff Nights provides other essential nutrients that help you maintain your peak sexual health.

35.     It was further part of the conspiracy that defendant HARVEY and TSN promoted "Zotrex" over the Internet at www.zotrex.net, www.orderyourstoday.com, and www.TSN2000.com as a "dietary supplement" that contained "natural compounds that work similarly to prescription ED drugs without the negative side effects."  Although

12

TSN listed "ophioglossum polyphylious" (a fictitious name and non-existent ingredient created by defendant HARVEY) on the Zotrex brand label, it falsely and fraudulently omitted OT, sulfoaildenafil, or what appeared to be a sildenafil drug analogue from its list of ingredients set forth on the Zotrex label and packaging.

## OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY

36.   In furtherance of the conspiracy and scheme and artifice to defraud alleged above and to effect the object thereof, the following overt acts, among others, were committed and caused to be committed by defendant HARVEY, UC1, or UC2, or a combination thereof, in the District of Utah and elsewhere:

| Overt Act | Date of Event (on or about) | Description of Event |
|---|---|---|
| 1 | 03/28/07 | Defendant HARVEY orders 3 kilograms of OT from UC2. (e-mail) |
| 2 | 04/13/07 | Defendant HARVEY forwards a copy of Chemical Analysis Report prepared by San Rafael Chemical Services to UC2, acknowledging the presence in OT of "a compound with similar characteristics to sildenafil" and a request to keep analysis confidential. (e-mail) |
| 3 | 04/13/07 | UC2 informs defendant HARVEY that "compound that has similar characteristics to sildenafil will disappear in future shipments" and that "future shipments will probably come directly from China." (e-mail) |
| 4 | 04/25/07 | Defendant HARVEY submits OT sample to Flora Research Laboratories for an ED drug screen (Sildenafil Citrate, Tadalafil Citrate, Vardenafil HCI, etc.). |

| Overt Act | Date of Event (on or about) | Description of Event |
|---|---|---|
| 5 | 05/01/07 | In response to an inquiry from defendant HARVEY concerning the OT sample submitted to Flora Research Laboratories for testing, the lab's director notes, "We have not completed the written report but we have confirmed that your sample was adulterated with an ED drug analog.  It appears to be a recent modification of a sildenafil analog that the FDA has identified and confirmed.  I believe they are calling the compound thionesildenafil.  Based on this finding, this product would not be a dietary supplement because it contains an unapproved drug." (e-mail) |
| 6 | 05/01/07 | Flora Research Laboratories provides defendant HARVEY with Analytical Report noting that the sample (OT) provided by TSN showed two "peaks" "that appear to be sildenafil drug analogs," that the small peak was "similar to sildenafil," and the large peak "matches a recently identified sildenafil analog." (fax) |
| 7 | 05/04/07 | Defendant HARVEY requests Flora Research Laboratories director not to send the Analytical Report "to any third parties at the present time." (e-mail) |
| 8 | 05/04/07 | Defendant HARVEY forwards Flora Research Laboratories Analytical Report to UC2. (e-mail) |
| 9 | 05/04/07 | UC2 informs defendant HARVEY that he will send another 10 gram sample of OT for him to use and submit to Flora Research Laboratories for another test. (e-mail) |
| 10 | 05/07/07 | Defendant HARVEY asks UC2, "Will the new sample work just as well but still test negative for thionesildenafil?" (e-mail) |
| 11 | 05/07/07 | UC2 responds to above e-mail from defendant HARVEY, stating "I was told that the original OT had something similar to thiones structure.  The new one will not have this structure.  It shall work just as well.  I will probably send out new sample sometime late this week." (e-mail) |

14

| Overt Act | Date of Event (on or about) | Description of Event |
|---|---|---|
| 12 | 05/09/07 | Defendant HARVEY responds to the above e-mail from UC2, stating "I will need enough material to send 20 capsules to the lab and to make another 100-200 capsules to send out for people to try. I need two things to happen. I need the product to work the same for the people who try it and I need to be clean of thionesildenafil." (e-mail) |
| 13 | 05/13/07 | UC2 advises defendant HARVEY "My understanding is that the compound in the material shows strong similarity to thionesildenafil on hplc, however, it is not. At the moment, the lab here is working to adjust the material, so that while it retains its main character, it won't show similar traits to thionesi. I am waiting for the result here and will keep you updated." (e-mail) |
| 14 | 06/01/07 | UC2 advises defendant HARVEY that new material "didn't pass the test, and hplc still shows the thione link. Lab will restart working on it on Monday. At the same time there shall be no problem that you sell to all countries other than Korea/Japan/US." (e-mail) |
| 15 | 06/19/07 | Defendant HARVEY advises UC2 that he needs "to order 3KG of OT but [he wants] it to be just like the previous batches. I only have one (big) customer that cares about the mystery peak (thionesildenafil) while everyone else wants material that definitely is the same as before." (e-mail) |
| 16 | 06/19/07 | UC2 responds to the above e-mail from defendant HARVEY, stating among other things that "The lab here is still working on the peak thing at the moment and they told me they shall be able to solve the mystery soon (Unfortunately they haven't yet solved the problem now it has been more than a month). On the other hand, I can advise factory to ship you 3 kgs of original OT right away. I was told that they can leave China around Friday here and reach you next Friday. Will this time frame OK with you?" (e-mail) |

| Overt Act | Date of Event (on or about) | Description of Event |
|---|---|---|
| 17 | 06/23/07 | UC2 advises defendant HARVEY that "3 kgs of original OT has been shipped.  You shall receive it in about 7 days."  UC2 encloses an invoice and directs defendant HARVEY to wire payment to an account at Standard Chartered Bank in Hong Kong, China in the name of Ruijin Zhonggyo Co. Ltd. (a company in Beijing, China). (e-mail) |
| 18 | 06/29/07 | TSN wires approximately $4,200 from the TSN1 account (Utah) to the RZ account (China) for the purchase of OT. |
| 19 | 09/04/07 | Defendant HARVEY advises UC2 that, among other things, "[t]he OT project is still progressing nicely and I have a dozen or so customers that are very close to major launches and I anticipate rapidly increasing volumes over the next six months.  I will need to order more material soon.  as you know, there is still an issue with the OT material that we are using."  Defendant HARVEY mentions the two sets of lab tests and a consultation with a "well-respected herbologist."  Defendant HARVEY adds, "In a voice mail you left several weeks ago, you mentioned that you now have a material that does not have the peak on the chromatogram that has caused the problem.  Here is my dilemma.  Do I use the material with the peak that I know works very well or do I use material without the peak that keeps me safe but may not work." (e-mail) |
| 20 | 09/10/07 | UC2 advises defendant HARVEY, among other things, that "I am mailing you new sample of OT that is without any trace of thione." (e-mail) |

| Overt Act | Date of Event (on or about) | Description of Event |
|---|---|---|
| 21 | 10/05/07 | Defendant HARVEY advises UC1, among other things, that original OT uses synthetic materials, that Flora Research Laboratories did not know what the compounds found in the OT were, and that they only made an "assumption" that the compound might be thionesildenafil.  Acknowledging it is impossible to predict what the FDA will do, defendant HARVEY suggested, "The solution, I think is to have your own lab tests available (for your specific pill) for immediate inspection by anyone who asks.  Maybe even publish them on your website.  Don't make any outrageous claims or comparisons to viagra that will draw scrutiny.  Build the brand to 1-3 million dollars per month and then rebrand and start over." (e-mail) |
| 22 | 10/08/07 | Defendant HARVEY receives a complaint from a customer that, among other things, the samples recently provided "isn't very good," "doesn't work nearly as long," and that the "new product lasts about 4 hours on me, while the original formula lasts about 4 days on me." (e-mail) |
| 23 | 10/09/07 | Defendant HARVEY forwards the above complaint to UC2 and asks, "Do you still have any of the original OT material that contained the thione compounds?" (e-mail) |
| 24 | 10/09/07 | UC2 responds to the above e-mail from defendant HARVEY, stating, among other things, that "I do have the original OT." (e-mail) |
| 25 | 10/09/07 | Defendant HARVEY responds to the above e-mail from UC2 stating "Will the original OT be available on an ongoing basis or do you have limited supplies that will no longer be available once they are depleted?" (e-mail) |
| 26 | 10/09/07 | UC2 responds to the above e-mail from defendant HARVEY, stating "I have the original on an ongoing base.  However, I am hoping I will have new material that is as good soon to replace it.  Before that happens, I have original all the time."  (e-mail) |

| Overt Act | Date of Event (on or about) | Description of Event |
|---|---|---|
| 27 | 10/10/07 | UC2 advises defendant HARVEY, among other things, that "I think no matter how we talk, your customer needs to understand there is the FDA issue no matter how you look at it. Even if you sell a new kind of salt, you will have the same issue. The best solution is to have a product that FDA can't **immediately** find fault with. And this is what I have been working on." (e-mail) |
| 28 | 10/10/07 | Defendant HARVEY forwards the above e-mail to UC1. (e-mail) |
| 29 | 10/26/07 | TSN wires approximately $4,200 from the TSN1 account (Utah) to the RZ account (China) for the purchase of OT. |
| 30 | 10/31/07 | Defendant HARVEY advises UC2, among other things, that "I need to order 5 KG of the Original OT material." (e-mail) |
| 31 | 10/31/07 | 5 kilograms of OT sent from China to TSN. (e-mail) |
| 32 | 11/20/07 | TSN wires approximately $7,000 from the TSN1 account (Utah) to the RZ account (China) for the purchase of OT. |
| 33 | 12/05/07 | Defendant HARVEY advises UC2 that "I need to order 10KG of Original OT Material at $1350 per KG." (e-mail) |
| 34 | 01/04/08 | TSN wires approximately $14,000 from the TSN1 account (Utah) to the RZ account (China) for the purchase of OT. |
| 35 | 03/07/08 | UC2 advises defendant HARVEY, among other things, that "Pls arrange the wire transfer for the last delivery to the factory, as it has been bugging me for the payment, as I made guarantee for you. I myself have been working on new product and I am hoping soon I will get a working product that is clean of the thione." (e-mail) |
| 36 | 03/11/08 | TSN wires approximately $13,500 from the TSN1 account (Utah) to the RZ account (China) for the purchase of OT. |
| 37 | 03/12/08 | UC1 orders (invoice no. 111128) Stiff Nights, Aziffa, and Hard Drive from TSN for approximately $24,103.93. |

| Overt Act | Date of Event (on or about) | Description of Event |
|---|---|---|
| 38 | 05/30/08 | Defendant HARVEY orders (invoice no. 08053002) 10 kilograms of OT from UC2 for approximately $13,500. |
| 39 | 05/30/08 | Defendant HARVEY orders (invoice no. 08053001) 10 kilograms of OT from UC2 for approximately $13,500. |
| 40 | 06/09/08 | TSN wires approximately $13,500 from the TSN1 account (Utah) to the RZ account for the purchase of OT. |
| 41 | 06/20/08 | UC1 orders (invoice no. 111600) Stiff Nights from TSN for approximately $20,075.83. |
| 42 | 07/10/08 | TSN wires approximately $13,500 from the TSN1 account (Utah) to the RZ account (China) for the purchase of OT. |
| 43 | 07/25/08 | UC1 issues check no. 20169 to TSN in the amount of approximately $25,000 as payment for invoice no. 111128.  TSN deposits check in the TSN2 account on or about 7/30/08. |
| 44 | 07/31/08 | Defendant HARVEY forwards to UC1 e-mail attaching article titled, "Feds Seize Adulterated ED Product" which states, among other things, that "Acting on behalf of the FDA, U.S. Marshall's seized $74,000 worth of Xiadafil VIP product from Miami, Fla.-based SEI Pharmaceuticals, after the company rejected FDA's request to recall the product, which was found to contain hydroxhomosildenafil, a chemical similar to sildenafil, the active ingredient in Viagra." (e-mail) |
| 45 | 07/31/08 | UC1 responds to the above e-mail from defendant HARVEY, stating "Both defendants are out on bail, pending trials; they each face up to three years in prison if convicted.  3 years isn't bad.  I thought it would be worse.  OUCH, not in BUTT!!!!" (e-mail) |
| 46 | 07/31/08 | Defendant HARVEY responds to the above e-mail from UC1, stating "The key here is that they refused to cooperate numerous times when the FDA asked them to stop." (e-mail) |

| Overt Act | Date of Event (on or about) | Description of Event |
|---|---|---|
| 47 | 07/31/08 | UC1 responds to the above e-mail from defendant HARVEY, stating "I hope we're going to get a few months out of this. Do you think I should do the same if the FDA comes. They got 3 additional months. This is the only product I sell? How much trouble will he get in legally?" (e-mail) |
| 48 | 08/22/08 | UC1 orders (invoice no. 111851) Stiff Nights and Aziffa from TSN for approximately $39,849.60. |
| 49 | 08/28/08 | Defendant HARVEY orders (invoice no. 08082801) 10 kilograms of OT from UC2 for approximately $13,500. |
| 50 | 08/28/08 | TSN wires approximately $13,500 from the TSN1 account (Utah) to the RZ account (China) for the purchase of OT. |
| 51 | 09/19/08 | UC1 orders (invoice no. 111962) Stiff Nights and Aziffa from TSN for approximately $21,516.84. |
| 52 | 09/26/08 | UC1 issues check no. 20246 to TSN in the amount of approximately $20,000 as partial payment for invoice no. 111600. TSN deposits check in the TSN2 account on or about 10/06/08. |
| 53 | 09/26/08 | TSN wires approximately $32,500 from the TSN1 account (Utah) to the RZ account (China) for the purchase of OT. |
| 54 | 10/01/08 | UC1 orders (invoice no. 112007) Stiff Nights from TSN for approximately $2,955.28. |
| 55 | 10/01/08 | TSN sends via United Parcel Service ("UPS") to UC1 four shipments of Stiff Nights (invoice no. 112007). |
| 56 | 10/13/08 | UC1 orders (invoice no. 112080) Stiff Nights and Aziffa from TSN for approximately $49,280. |
| 57 | 10/14/08 | TSN wires approximately $13,500 from the TSN1 account (Utah) to the RZ account (China) for the purchase of OT. |

| Overt Act | Date of Event (on or about) | Description of Event |
|---|---|---|
| 58 | 10/24/08 | UC1 issues check no. 20299 to TSN in the amount of approximately $15,000 as partial payment for invoice no. 111962. TSN deposits check in the TSN2 account on or about 11/20/08. |
| 59 | 10/29/08 | UC1 orders (invoice no. 112124) Stiff Nights and Aziffa from TSN for approximately $62,809.43. |
| 60 | 10/31/08 | TSN wires approximately $32,500 from the TSN1 account (Utah) to the RZ account (China) for the purchase of OT. |
| 61 | 11/03/08 | UC1 issues check no. 20309 to TSN in the amount of approximately $20,000 as partial payment for invoice no. 111851. TSN deposits check in the TSN2 account on or about 11/10/08. |
| 62 | 11/21/08 | UC1 issues check no. 20337 to TSN in the amount of approximately $50,000 as partial payment for invoice no. 112080. TSN deposits check in the TSN2 account on or about 12/03/08. |
| 63 | 11/24/08 | TSN wires approximately $32,500 from the TSN2 account (Utah) to the RZ account (China) for the purchase of OT. |
| 64 | 11/25/08 | UC1 orders (invoice no. 112218) Stiff Nights from TSN for approximately $56,390.77. |
| 65 | 11/24/08 | TSN sends via UPS to UC1 nine shipments of Stiff Nights (invoice no. 112218). |
| 66 | 11/25/08 | UC1 orders (invoice no. 112242) Stiff Nights from TSN for approximately $23,479.42. |
| 67 | 11/26/08 | TSN sends via UPS to UC1 one shipment of Stiff Nights (invoice no. 112242). |
| 68 | 12/03/08 | UC1 issues check no. 20349 to TSN in the amount of approximately $60,000 as partial payment for invoice no. 112124. TSN deposits check in the TSN2 account on or about 12/10/08. |

| Overt Act | Date of Event (on or about) | Description of Event |
|---|---|---|
| 69 | 12/09/08 | UC1 issues check no. 20375 to TSN in the amount of approximately $40,000 as partial payment for invoice no. 112218. TSN deposits check in the TSN2 account on or about 12/18/08. |
| 70 | 12/11/08 | TSN wires approximately $32,500 from the TSN2 account (Utah) to the RZ account (China) for the purchase of OT. |
| 71 | 12/15/08 | UC1 orders (invoice no. 112316) Stiff Nights from TSN for approximately $11,499.38. |
| 72 | 12/15/08 | TSN sends via UPS to UC1 one shipment of Stiff Nights (invoice no. 112316). |
| 73 | 01/06/09 | UC1 orders (invoice no. 112404) Size Matters, Aziffa, and Stiff Nights from TSN for approximately $123,200. |
| 74 | 01/09/09 | TSN wires approximately $60,000 from the TSN2 account (Utah) to the RZ account (China) for the purchase of OT. |
| 75 | 01/15/09 | TSN wires approximately $60,000 from the TSN2 account (Utah) to the RZ account (China) for the purchase of OT. |
| 76 | 01/20/09 | UC1 orders (invoice no. 112470) Stiff Nights from TSN for approximately $115,066.72. |
| 77 | 01/21/09 | UC1 issues check no. 20441 to TSN in the amount of approximately $60,000 as partial payment for invoice no. 112404. TSN deposits check in the TSN2 account on or about 1/30/09. |
| 78 | 02/02/09 | TSN wires approximately $60,000 from the TSN2 account (Utah) to the RZ account (China) for the purchase of OT. |
| 79 | 02/10/09 | UC1 orders (invoice no. 112557) Stiff Nights from TSN for approximately $195,154.94. |
| 80 | 02/18/09 | UC1 orders (invoice no. 112594) Stiff Nights, Aziffa, and Size Matters from TSN for approximately $143,998.98. |
| 81 | 02/18/09 | TSN wires approximately $60,000 from the Novacare account (Utah) to the RZ account (China) for the purchase of OT. |

22

| Overt Act | Date of Event (on or about) | Description of Event |
|---|---|---|
| 82 | 03/03/09 | UCI issues check no. 20505 to TSN in the amount of approximately $60,000 as partial payment for invoice no. 112470. TSN deposits check in the Novacare account on or about 3/11/09. |
| 83 | 03/03/09 | UC1 requests defendant HARVEY to, among other things, "[g]et another name from [UC2] that is legal and legit for the Golden Spear Grass that we haven't used before." (e-mail) |
| 84 | 03/04/09 | Defendant HARVEY asks UC2's assistant "Can you suggest any common names or other types of names (maybe Chinese names) that can be used to refer to the OT. Right now we are using Golden Spear Grass Extract." (e-mail) |
| 85 | 03/05/09 | In response to several names provided by UC2 and forwarded by defendant HARVEY, UC1 selects "Jinjian Extract" and notes "Don't put grass in there. It's too common of a name. Also reserve Shexu Grass for me. I'll use that name for one of our foreign markets." (e-mail) |
| 86 | 03/10/09 | TSN wires approximately $60,000 from the Novacare account (Utah) to the RZ account (China) for the purchase of OT. |
| 87 | 03/17/09 | UC1 orders (invoice no. 112713) Stiff Nights from TSN for approximately $139,337.63. |
| 88 | 03/30/09 | UC1 issues check no. 20548 to TSN in the amount of approximately $140,000 as partial payment for invoice no. 112557. TSN deposits check in the Novacare account on or about 4/7/09. |
| 89 | 04/23/09 | UC1 issues check no. 20624 to TSN in the amount of approximately $170,000 as payment for invoice no. 112713. TSN deposits check in the Novacare account on or about 4/29/09. |
| 90 | 04/24/09 | UC1 orders (invoice no. 112885) Mojo from TSN for approximately $27,156.08. |
| 91 | 04/24/09 | TSN sends via UPS to UC1 five shipments of Mojo (invoice no. 112885). |

| Overt Act | Date of Event (on or about) | Description of Event |
|---|---|---|
| 92 | 04/27/09 | TSN orders 50 kilograms of OT from UC2's assistant. |
| 93 | 04/27/09 | 50 kilograms of OT sent from China to TSN |
| 94 | 04/27/09 | TSN wires approximately $60,000 from the Novacare account (Utah) to the RZ account (China) for the purchase of OT. |
| 95 | 05/19/09 | TSN wires approximately $60,000 from the Novacare account (Utah) to the RZ account (China) for the purchase of OT. |
| 96 | 05/20/09 | UC1 orders (invoice no. 113020) Stiff Nights from TSN for approximately $129,756.73. |
| 97 | 05/22/09 | UC1 orders (invoice no. 113015) Stiff Nights from TSN for approximately $5,814.03. |
| 98 | 05/22/09 | TSN sends via UPS to UC1 one shipment of Stiff Nights (invoice no. 113015). |
| 99 | 05/26/09 | UC1 issues check no. 20672 to TSN in the amount of approximately $175,000 as partial payment for invoice no. 113020. TSN deposits check in the Novacare account on or about 6/1/09. |
| 100 | 06/16/09 | UC1 orders (invoice no. 113141) Aziffa, Size Matters, and Stiff Nights from TSN for approximately $274,958.67. |
| 101 | 06/19/09 | UC1 issues check no. 20783 to TSN in the amount of approximately $250,000 as partial payment for invoice no. 113141. TSN deposits check in the Novacare account on or about 6/26/09. |
| 102 | 06/25/09 | TSN wires approximately $60,000 from the Novacare account (Utah) to the RZ account (China) for the purchase of OT. |
| 103 | 07/09/09 | TSN wires approximately $120,000 from the Novacare account to RZ account for the purchase of OT. |
| 104 | 07/10/09 | UC1 orders (invoice no. 113268) Stiff Nights from TSN for approximately $138,827.92. |

| Overt Act | Date of Event (on or about) | Description of Event |
|---|---|---|
| 105 | 07/20/09 | UC1 issues check no. 20845 to TSN in the amount of approximately $100,000 as partial payment for invoice no. 113268. TSN deposits check in the Novacare account on or about 7/28/09. |
| 106 | 08/17/09 | TSN wires approximately $120,000 from the Novacare account (Utah) to the RZ account (China) for the purchase of OT. |
| 107 | 08/26/09 | UC1 orders (invoice no. 113523) Stiff Nights from TSN for approximately $143,590.94. |
| 108 | 09/10/09 | TSN wires approximately $12,000 from the Novacare account (Utah) to the RZ account (China) for the purchase of OT. |
| 109 | 10/02/09 | TSN wires approximately $12,000 from the Novacare account (Utah) to the RZ account (China) for the purchase of OT. |
| 110 | 10/06/09 | UC1 orders (invoice no. 113710) Stiff Nights and Aziffa from TSN for approximately $183,909.04. |
| 111 | 11/02/09 | TSN wires approximately $12,000 from the Novacare account (Utah) to the RZ account (China) for the purchase of OT. |
| 112 | 11/07/09 | Defendant HARVEY e-mails to UC2's assistant link pertaining to 11/6/09 FDA alert regarding Stiff Nights and states "This link is related to my customer that got into trouble with the FDA due to the product we make for them using Ophioglossum Thermale" and "please take a look at it and give me your feedback." (e-mail) |
| 113 | 11/07/09 | UC2's assistant responds to the above e-mail from defendant HARVEY, stating "I have read the news. We will talk when we meet. Have a good flight." (e-mail) |
| 114 | 11/18/09 | UC1 advises defendant HARVEY "I'm wondering if we should do another production run or if we should just be happy with our happy ending. So far, the FDA hasn't said a peep in 10 days. They have cut off my bottle supply as Future Pak won't touch Stiff Nights until I get it cleared with the FDA. I am soon to run out of bottles." (e-mail) |

25

| Overt Act | Date of Event (on or about) | Description of Event |
|---|---|---|
| 115 | 11/18/09 | Defendant HARVEY responds to the above e-mail from UC1, stating, among other things, that "We can do some bottles for you and already have pills in stock to do it. . . .. Usually it takes the FDA (and any agency) to get around to stuff. I would just do business as usual until they say stop because so far we don't know what their issue is and we haven't done anything wrong. . . .. I met with [UC2 and his assistant] here in China two days ago. If we have to, we can make the pills in China. I say keep going and try to get as much of your inventory pushed out to distributors as possible." (e-mail) |
| 116 | 12/09/09 | UC1 issues check no. 21177 to TSN in the amount of approximately $435,804.48 as payment for invoices nos. 113523 and 113710. TSN deposits check in the Novacare account on or about 12/21/09. |
| 117 | 12/10/09 | UC1 advises defendant HARVEY, among other things, that "I have $650K of product in inventory. I'm hoping to sell it before the feds want it. My sales have tanked by 80% over the last 2 weeks." (e-mail) |
| 118 | 01/13/10 | Defendant HARVEY advises UC2's assistant that "[u]nfortunately we are still dealing with FDA issues related to this material but we hope to resolve soon and place another order. Thank you for your patience as we work through this." (e-mail) |
| 119 | 03/30/10 | TSN wires approximately $12,000 from the Novacare account (Utah) to the RZ account (China) for the purchase of OT. |
| 120 | 04/13/10 | TSN wires approximately $24,000 from the Novacare account (Utah) to the RZ account (China) for the purchase of OT. |
| 121 | 04/15/10 | UC1 orders (invoice no. 115148) Stiff Nights from TSN for approximately $39,547.21. |
| 122 | 04/15/10 | TSN sends via UPS to UC1 one shipment of Stiff Nights (invoice no. 115148). |

| Overt Act | Date of Event (on or about) | Description of Event |
|---|---|---|
| 123 | 04/15/10 | TSN sends via Con-way Freight to UC1 one shipment of Stiff Nights (invoice no. 115148). |
| 124 | 04/22/10 | UC1 orders (invoice no. 115208) Stiff Nights from TSN for approximately $44,165. |
| 125 | 04/22/10 | TSN sends via Con-way Freight to UC1 one shipment of Stiff Nights (invoice no. 115208). |
| 126 | 04/22/10 | UC1 issues check no. 21493 to TSN in the amount of approximately $70,000 as partial payment for invoice no. 115148. TSN deposits check in the Novacare account on or about 5/6/10. |
| 127 | 05/03/10 | TSN wires approximately $30,000 from the Novacare account (Utah) to the RZ account (China) for the purchase of OT. |
| 128 | 05/06/10 | Defendant HARVEY advises UC2's assistant that the FDA "visited the second week of March and asked a lot of questions about one of our clients and the product we make for them. They took sames [sic] of three raw materials, including OT. We haven't heard anything back from them and don't have any idea when or if they will contact us again about this issue or what they intend to do. Do you know of anyone in China that we can work together with to make our product in China and ship directly to our clients in the USA?" (e-mail) |
| 129 | 05/06/10 | UC2's assistant responds to the above e-mail from defendant HARVEY, stating, among other things, that "I am so sorry to hear that. I totally understand you. We can get GMP factory here in China to manufacture the 20 capsules. Depending on the quantity we can either ship via Air Freight or regular mail." (e-mail) |
| 130 | 05/07/10 | UC1 orders (invoice no. 115328) Stiff Nights from TSN for approximately $59,626.77. |
| 131 | 05/13/10 | TSN wires approximately $30,000 from the Novacare account (Utah) to the RZ account (China) for the purchase of OT. |

| Overt Act | Date of Event (on or about) | Description of Event |
|---|---|---|
| 132 | 05/14/10 | UC1 issues check no. 21544 to TSN in the amount of approximately $100,000 as partial payment for invoice nos. 115208 and 115328. TSN deposits check in the Novacare account on or about 5/21/10. |
| 133 | 05/18/10 | TSN wires approximately $30,000 from the Novacare account (Utah) to the RZ account (China) for the purchase of OT. |
| 134 | 05/26/10 | UC1 orders (invoice no. 115485) Stiff Nights from TSN for approximately $99,689.56. |
| 135 | 05/28/10 | Defendant HARVEY advises UC2's assistant "We talked about the possibility of making capsules in China using OT and then shipping them to the U.S. Have you done anything like that before. Do you anticipate any trouble with Customs or FDA for such a project." (e-mail) |
| 136 | 05/28/10 | UC2's assistant responds to the above e-mail from defendant HARVEY, confirming they have done this for some customers in the United States and Europe, depending on volume. (e-mail) |
| 137 | 05/28/10 | UC2's assistant responds to the above e-mail from defendant HARVEY, stating, among other things, that "My only concern is the quantity. . . . . Basically, the recipient will need to clear customs on his end as it is more than what express delivery can handle. Either bulk pill or finished bottles will be difficult. So that find another manufacturer to do the manufacture in the U.S. is probably the best solution for this kind of quantity." (e-mail) |

| Overt Act | Date of Event (on or about) | Description of Event |
|---|---|---|
| 138 | 05/29/10 | Defendant HARVEY responds to the above e-mail from UC2's assistant, noting, among other things, that "I have many clients for OT formulations but only one has received scrutiny from the FDA that lead back to my company as the manufacturer. . . .. I am looking for an alternative in the event that I am not allowed to manufacture capsules using OT in the future. I am working through options with a company in Mexico, India, Canada, USA, and your company. Product would not be shipped to NovaCare/TSN but to another unrelated company. . . .. We would need more than 1,000,000 capsules per month." (e-mail) |
| 139 | 05/29/10 | Defendant HARVEY responds to the above e-mail from UC2's assistant, asking "Have you ever shipped OT directly into Mexico? (e-mail) |
| 140 | 05/29/10 | UC2's assistant responds to the above e-mail from defendant HARVEY, stating "We have not shipped OT to Mexico." (e-mail) |
| 141 | 05/29/10 | Defendant HARVEY asks UC2 "Have you been able to develop anything that works similarly to OT but different enough that we could use it once the FDA asks us to stop selling OT? It doesn't have to work as well as OT, but it has to work better than 90% of the other stuff out there being used for Male Sexual Vitality." (e-mail) |
| 142 | 06/21/10 | UC1 issues check no. 21620 to TSN in the amount of approximately $100,000 as payment for invoice no. 115485. TSN deposits check in the Novacare account on or about 6/21/10. |

All in violation of 18 U.S.C. § 371.

/

/

/

**Count 2 through 13**
**18 U.S.C. § 1343**
**(Wire Fraud)**

37.    The Grand Jury incorporates by reference the factual allegations in

paragraphs 1 through 14 and 18 through 36 above as if fully stated herein.

38.    Beginning from on or about a date unknown to the Grand Jury but at least

as early as April 2007 to in or around June 2010, in the Central Division of the District of

Utah and elsewhere, defendant KELLY DEAN HARVEY, UC1, UC2, and others known

and unknown to the Grand Jury, did knowingly and willfully devise and intend to devise a

scheme and artifice to defraud and intend to devise a scheme and artifice to defraud and

to obtain money by means of false and fraudulent pretenses and representations as

described above.

39.    On or about the dates listed below, in the Central Division of the District of

Utah and elsewhere,

**KELLY DEAN HARVEY,**

defendant herein, UC1, UC2, and others known and unknown to the Grand Jury, for the

purpose of executing and attempting to execute said scheme and artifice to defraud and to

obtain money by means of false and fraudulent pretenses and representations, transmitted

and caused to be transmitted by means of wire communications in interstate commerce

the following writings, signs, signals, pictures, and sounds, in that defendant HARVEY

caused the following wire transfers of funds for the purchase of OT from China:

| Count | Date | Amount of Wire Transfer (approximately) | Sending Bank (Location) | Receiving Bank (Location) |
|---|---|---|---|---|
| 2 | 11/24/08 | $32,500 | TSN2 account (Utah) | RZ account (China) |
| 3 | 01/09/09 | $60,000 | TSN2 account (Utah) | RZ account (China) |
| 4 | 02/02/09 | $60,000 | TSN2 account (Utah) | RZ account (China) |
| 5 | 03/10/09 | $60,000 | Novacare account (Utah) | RZ account (China) |
| 6 | 06/25/09 | $60,000 | Novacare account (Utah) | RZ account (China) |
| 7 | 07/09/09 | $120,000 | Novacare account (Utah) | RZ account (China) |
| 8 | 08/17/09 | $120,000 | Novacare account (Utah) | RZ account (China) |
| 9 | 11/02/09 | $12,000 | Novacare account (Utah) | RZ account (China) |
| 10 | 03/30/10 | $12,000 | Novacare account (Utah) | RZ account (China) |
| 11 | 04/13/10 | $24,000 | Novacare account (Utah) | RZ account (China) |
| 12 | 05/03/10 | $30,000 | Novacare account (Utah) | RZ account (China) |
| 13 | 05/18/10 | $30,000 | Novacare account (Utah) | RZ account (China) |

All in violation of 18 U.S.C. §§ 1343 and 2.

/

31

### Count 14 through 22
### 18 U.S.C. § 1341
### (Mail Fraud)

40.     The Grand Jury incorporates by reference the factual allegations in paragraphs 1 through 14 and 18 through 36 above as if fully stated herein.

41.     Beginning from on or about a date unknown to the Grand Jury but at least as early as April 2007 to in or around June 2010, in the Central Division of the District of Utah and elsewhere, defendant KELLY DEAN HARVEY, UC1, UC2, and others known and unknown to the Grand Jury, did knowingly and willfully devise and intend to devise a scheme and artifice to defraud and intend to devise a scheme and artifice to defraud and to obtain money by means of false and fraudulent pretenses and representations as described above.

42.     On or about the dates listed below, in the Central Division of the District of Utah and elsewhere,

### KELLY DEAN HARVEY,

defendant herein, UC1, UC2, and others known and unknown to the Grand Jury, for the purpose of executing and attempting to execute said scheme and artifice to defraud and to obtain money by means of false and fraudulent pretenses and representations, deposited and caused to be deposited any matter and thing whatever to be sent and delivered by any private or commercial interstate carrier according to the directions thereon, in that

defendant HARVEY sent or caused to be sent, among others, the following shipments to

UC1 via UPS or Con-way Freight:

| Count | Date | Item (carrier) | Sender | Recipient |
|-------|------|----------------|--------|-----------|
| 14 | 10/01/08 | four shipments of Stiff Nights (UPS) | TSN | UC1 |
| 15 | 11/24/08 | nine shipments of Stiff Nights (UPS) | TSN | UC1 |
| 16 | 11/26/08 | one shipment of Stiff Nights (UPS) | TSN | UC1 |
| 17 | 12/15/08 | one shipment of Stiff Nights (UPS) | TSN | UC1 |
| 18 | 04/24/09 | five shipments of Mojo (UPS) | TSN | UC1 |
| 19 | 05/22/09 | one shipment of Stiff Nights (UPS) | TSN | UC1 |
| 20 | 04/15/10 | one shipment of Stiff Nights (UPS) | TSN | UC1 |
| 21 | 04/15/10 | one shipment of Stiff Nights (Con-way Freight) | TSN | UC1 |
| 22 | 04/22/10 | one shipment of Stiff Nights (Con-way Freight) | TSN | UC1 |

All in violation of 18 U.S.C. §§ 1341 and 2.

## Count 23 through 27
## 18 U.S.C. § 1956(a)(1)(B)(i)
## (Concealment Money Laundering)

43.     The Grand Jury incorporates by reference the factual allegations in

paragraphs 1 through 14, 18 through 36, 38, 39, 41, and 42 above as if fully stated herein.

44.     At all times relevant to this Indictment, defendant HARVEY maintained

and controlled the following bank accounts:

- TSN Asset Management, LLC - Account No. xxxxxx-1194 ("Account 1194") at First Bank.

- TSN Asset Management, LLC - Account No. xxxxxx-2673 ("Account 2673") at First Bank.

- Kelly and Jennifer Harvey - Account No. xxxxxxxx-9036 ("Account 9036") at Key Bank.

45. On or about June 26, 2009, defendant HARVEY caused to be deposited in the Novacare account, and commingled with other "legitimate" funds, $250,000 stemming from TSN sales of ED product to UC1. Defendant HARVEY caused such commingling of funds in order to disguise the true source and nature of ED sales proceeds.

46. On or about July 7, 2009, defendant HARVEY caused to be deposited in the Novacare account, and commingled with other "legitimate" funds, $100,000 stemming from TSN sales of ED product to UC1. Defendant HARVEY caused such commingling of funds in order to disguise the true source and nature of ED sales proceeds.

47. On or about the dates identified below, in the Central Division of the District of Utah,

**KELLY DEAN HARVEY,**

defendant herein, did knowingly conduct and attempt to conduct financial transactions affecting interstate commerce, that is, causing ED product sales proceeds generated by the wire fraud described in paragraphs 18 through 40 above and mail fraud described in

paragraphs 18 through 36, 41, and 42 above, to be transferred to various accounts or for

various purchases as described below, knowing the funds involved in these transactions

represented the proceeds of some form of unlawful activity, and which transactions in fact

involved the proceeds of specified unlawful activity (to wit: wire fraud and mail fraud in

violation of 18 U.S.C. §§ 1343 and 1341, respectively), with the intent to conceal and

disguise the nature, the location, the source, the ownership, and the control of the

proceeds of specified unlawful activity:

| Count | Dates of Transactions | Amount (Approximately) | Transaction Description |
|-------|----------------------|------------------------|-------------------------|
| 23 | 06/26/09 | $250,000 | Transfer of funds from Impulsaria to Novacare Account as payment for ED products. |
| 24 | 07/07/09 | $100,000 | Transfer of funds from Impulsaria to Novacare Account as payment for ED products. |
| 25 | 07/22/09 | $250,000 | Transfer of funds from Novacare account to Account 1194. |
| 26 | 07/23/09 | $250,000 | Transfer of funds from Account 1194 to Account 2673. |
| 27 | 10/30/09 | $200,000 | Transfer of funds from Account 2673 to Account 9036. |

All in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2.

/

/

/

**Count 28 through 31**
**18 U.S.C. § 1957**
**(Monetary Transaction Money Laundering)**

48.     The Grand Jury incorporates by reference the factual allegations in paragraphs 1 through 14, 18 through 36, 38, 39, 41, 42, and 44 to 47 above as if fully stated herein.

49.     At all times relevant to this Indictment, defendant HARVEY maintained and controlled the following investment and bank accounts:

- Kelly and Jennifer Harvey - Account 9036 at Key Bank.

- Kelly D. Harvey and Jennifer E. Harvey - Group Account No. xxxxxxxx-8001 at Ameriprise Financial ("Ameriprise"), an investment company under 31 U.S.C. § 5312(a)(2) ("Account 8001").

- Jennifer and Kelly Harvey - Account No. xxxxxx-xxxxxx-5021 ("Account 5021") at Ameriprise.

- Jennifer and Kelly Harvey - Account No. xxxxxx-xxxxxx-1133 ("Account 1133") at Ameriprise.

50.     On or about the dates identified below, in the Central Division of the District of Utah,

**KELLY DEAN HARVEY,**

defendant herein, did knowingly engage and attempt to engage in the following monetary transactions by, through, and to a financial institution, affecting interstate commerce, in criminally derived property of a value greater than $10,000, that is, the withdrawal, deposit, and transfer of U.S. currency, such property having been derived from a specified

36

unlawful activity (to wit: Wire Fraud and Mail Fraud, in violation of 18 U.S.C. §§ 1343

and 1341):

| Count | Date of Monetary Transaction | Amount (approximately) | Monetary Transaction |
|-------|------------------------------|------------------------|----------------------|
| 28 | 01/05/10 | $40,909.53 | Wire transfer from Account 9036 used to purchase property at 2201 Cottonwood Cove Lane, Cottonwood Heights, UT 84121. |
| 29 | 01/05/10 | $40,908.04 | Wire transfer from Account 9036 used to purchase property at 2217 Cottonwood Cove Lane, Cottonwood Heights, UT 84121. |
| 30 | 02/18/10 | $30,000 | Transfer of funds from Account 8001 to Account 5021. |
| 31 | 10/18/10 | $84,557.34 | Transfer of funds from Account 5021 to Account 1133. |

All in violation of 18 U.S.C. §§ 1957 and 2.

## NOTICE OF INTENTION TO SEEK CRIMINAL FORFEITURE

### First Claim of Forfeiture

1.     The allegations contained in Counts 1 through 22 of this Indictment are

realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to

18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).

2.     Upon conviction of one or more of the offenses alleged in Counts 1 through

22 of this Indictment, defendant KELLY DEAN HARVEY shall forfeit to the United

States any property, real or personal, which constitutes or is derived from proceeds

37

traceable to an offense constituting a "specified unlawful activity" ("SUA") (to wit: wire fraud, in violation of 18 U.S.C. § 1343, and mail fraud, in violation of 18 U.S.C. § 1341), and conspiracy to commit an SUA (to wit: mail and wire fraud conspiracy, in violation of 18 U.S.C. § 371).

3.    The property to be forfeited includes, but is not limited to, the following:

- A money judgment in the amount of $3,344,102.

- 2006 Toyota Tundra, VIN xxxxxxxxxxxxx-9326, titled to Kelly Dean Harvey.

- 2010 Honda Odyssey, VIN xxxxxxxxxxxxx-2223, titled to Kelly Dean Harvey.

- Real property located at 2201 Cottonwood Cove Lane, Cottonwood Heights, Utah.

- Real property located at 2217 Cottonwood Cove Lane, Cottonwood Heights, Utah.

- Kelly D. Harvey and Jennifer E. Harvey - Group ID No. xxxxxxxx-8001 at Ameriprise.

- Mr. Kelly D. Harvey - Account No. xxxxxxxx-0001 at Ameriprise.

- Mrs. Jennifer E. Harvey - Account No. xxxxxxxx-1001 at Ameriprise.

- Jennifer and Kelly Harvey - Account No. xxxxxx-xxxxxx-5021 at Ameriprise.

- Jennifer and Kelly Harvey - Account No. xxxxxx-xxxxxx-1133 at Ameriprise.

- A.H. - Account No. xxxxxx-xxxxx-93021 at Ameriprise.

- A.H. - Account No. xxxxxx-xxxxxx-2133 at Ameriprise.

- <u>B.H.</u> - Account No. xxxxxx-xxxxxx-2021 at Ameriprise.

- <u>B.H.</u> - Account No. xxxxxx-xxxxxx-0133 at Ameriprise.

- <u>C.H.</u> - Account No. xxxxxx-xxxxx-03021 at Ameriprise.

- <u>C.H.</u> - Account No. xxxxxx-xxxxxx-7133 at Ameriprise.

- <u>D.H.</u> - Account No. xxxxxx-xxxxxx-8021 at Ameriprise.

- <u>D.H.</u> - Account No. xxxxxx-xxxxxx-8133 at Ameriprise.

- <u>Kelly D. Harvey</u> - Ameriprise Insurance Account No. xxxxxx-xxxxxx-3004.

- <u>Kelly D. Harvey</u> - Ameriprise Insurance Account No. xxxxxx-xxxxxx-1004.

4.    If any of the property described above as result of any act or omission of

defendant KELLY DEAN HARVEY:

- cannot be located upon the exercise of due diligence,

- has been transferred or sold to, or deposited with, a third party,

- has been placed beyond the jurisdiction of the court,

- has been substantially diminished in value, or

- has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property of said

defendants up to the value of the forfeitable property described above, pursuant to 21

U.S.C. § 853(p), incorporated at 28 U.S.C. § 2461(c).

39

**Second Claim for Forfeiture**

1.     The allegations contained in Counts 23 through 31 are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to 18 U.S.C. § 982(a)(1)(A).

2.     Pursuant to 18 U.S.C. § 982(a)(1)(A), upon conviction of any offenses in violation of 18 U.S.C. §§ 1956 and 1957, defendant KELLY DEAN HARVEY shall forfeit to the United States any property, real or personal, involved in such offense(s), and any property traceable to such property.

3.     The property to be forfeited includes, but is not limited to, the following:

• A money judgment in the amount of $3,344,102;

• 2010 Honda Odyssey, VIN xxxxxxxxxxxxx-2223, titled to Kelly Dean Harvey;

• Real property located at 2201 Cottonwood Cove Lane, Cottonwood Heights, Utah;

• Real property located at 2217 Cottonwood Cove Lane, Cottonwood Heights, Utah;

• Kelly D. Harvey and Jennifer E. Harvey - Group ID No. xxxxxxxx-8001 at Ameriprise;

• Mr. Kelly D. Harvey - Account No. xxxxxxxx-0001 at Ameriprise.

• Mrs. Jennifer E. Harvey - Account No. xxxxxxxx-1001 at Ameriprise.

• Jennifer and Kelly Harvey - Account No. xxxxxx-xxxxxx-5021 at Ameriprise;

40

- <u>Jennifer and Kelly Dean Harvey</u>, Account No. xxxxxx-xxxxxx-1133 at Ameriprise;

- <u>A.H.</u>, Account No. xxxxxx-xxxxxx-2133 at Ameriprise;

- <u>A.H.</u>, Account No. xxxxxx-xxxxx-93021 at Ameriprise;

- <u>B.H.</u>, Account No. xxxxxx-xxxxxx-0133 at Ameriprise;

- <u>B.H.</u>, Account No. xxxxxx-xxxxxx-2021 at Ameriprise.

- <u>C.H.</u> - Account No. xxxxxx-xxxxx-03021 at Ameriprise.

- <u>C.H.</u> - Account No. xxxxxx-xxxxxx-7133 at Ameriprise.

- <u>D.H.</u> - Account No. xxxxxx-xxxxxx-8021 at Ameriprise.

- <u>D.H.</u> - Account No. xxxxxx-xxxxxx-8133 at Ameriprise.

4.      If any of the property described above, as result of any act or omission of

defendant KELLY DEAN HARVEY:

- cannot be located upon the exercise of due diligence,

- has been transferred or sold to, or deposited with, a third party,

- has been placed beyond the jurisdiction of the court,

- has been substantially diminished in value, or

- has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property of

defendant KELLY DEAN HARVEY up to the value of the forfeitable property described

/

41

above, pursuant to 21 U.S.C. § 853(p), incorporated at 28 U.S.C. 2461(c).

A TRUE BILL:

_____
FOREPERSON of the GRAND JURY

CARLIE CHRISTENSEN
United States Attorney

_____
MARK Y. HIRATA
Assistant United States Attorney

42